Desert Lawn Memorial Park, Inc. v. Commissioner.
Desert Lawn Memorial Park, Inc. v. Commissioner
Docket No. 74229.
United States Tax Court
T.C. Memo 1960-8; 1960 Tax Ct. Memo LEXIS 278; 19 T.C.M. (CCH) 32; T.C.M. (RIA) 60008; January 29, 1960
*278 Held, certain transfers of cemetery lots by petitioner to certain individuals constituted sales rather than security for loans. Orville B. Olson, Esq., Box 888, Pasco, Wash., for the petitioner. Norman H. McNeil, Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined a deficiency in petitioner's income and excess profits taxes for the fiscal years ending February 28, 1953 and 1956 in the amounts of $23,141.27 and $2,136.60, respectively. The pleadings place in issue only the deficiency determined for the year ending February 28, 1953. The parties agree on brief that the only question for our decision is whether certain transfers of cemetery lots by petitioner to three individuals during petitioner's fiscal year 1953 constituted sales of the lots giving rise to taxable income or were security for nontaxable loans from the individuals. Findings of Fact The stipulation of facts is incorporated herein by this reference. Petitioner is a corporation incorporated under the laws of the State of Washington on March 5, 1952, and its principal place of business is in Kennewick, Benton County, Washington. *279 Petitioner was authorized to issue 500 shares of stock having no par value. Petitioner's books reflect that as of February 28, 1953 it had issued capital stock in the amount of $38,350, paid for in cash, notes receivable, assets and services. Petitioner's corporation income tax return for the taxable year ending February 28, 1953 was filed with the district director of internal revenue at Tacoma, Washington. Petitioner was organized primarily for the purpose of owning, developing and operating a cemetery at Kennewick, Washington. It was promoted by two individuals named Hawley and Clark from Spokane, Washington, and by Gene Meyers. During the first 2 or 3 years of its existence, it was managed and controlled by Meyers, who not only had charge of the development work but also was its only salesman for a while. Land was acquired and was platted off into burial lots and roads, and construction of the cemetery was started in the summer of 1952. A large number of burial lots, consisting of six grave spaces each, were sold between June 1952 and February 28, 1953. The first lots were sold for $270 per lot but the price increased to $360 and $370 per lot by February 1953. Petitioner's *280 books reflect a total contract price for lots sold during this period of $111,519, of which $72,298 was paid in prior to February 28, 1953. Each of the transactions whereby petitioner transferred burial lots during the period involved was evidenced by a form warranty deed wherein petitioner "does hereby sell and convey unto the said part - of the second part, and - heirs forever" the specified lot or lots. The only restrictions contained in the deeds were that the property be used solely for burial purposes and that no part of the premises should ever be mortgaged or otherwise encumbered. During the latter part of 1952 petitioner was apparently running short of funds, and Meyers approached a number of people in the vicinity in an effort to raise additional funds. The facts with respect to the transactions with the three individuals here involved are as follows: 1. On October 1, 1952, Otto Olds and his wife purchased a lot containing six grave spaces for $330, and petitioner conveyed title to the lot to the Olds by warranty deed dated October 5, 1952. Olds regarded this lot as being purchased for use by his family, and this transaction is not in controversy. On October 3, 1952, the *281 Olds purchased eight additional lots from petitioner for $2,640 and received a warranty deed from petitioner evidencing this transaction. Olds considered that he bought these eight lots and this transaction is not in controversy. However, Meyers, who sold the lots to Olds, advised Olds that petitioner would "pick up" the lots in a few years, at which time Olds expected petitioner would buy back the lots and he would deed the lots to petitioner. Meyers assured Olds that the lots would be worth more when petitioner took them back, and he expected to receive back more than the original purchase price for the eight lots. On January 14, 1953, Meyers again approached Olds and advised him of the need for additional money, stating that petitioner wanted to borrow $15,000 from Olds on a note payable in 1 year with interest at the rate of 15 per cent. Olds was advised by Meyers that the trustees or directors of petitioner would endorse the note but no form of security was offered. Olds did not like the idea of lending money without security so Meyers made an alternative proposal whereby petitioner would give Olds title to lots "as a form of security." Olds agreed to take lots for the full *282 amount, the number of lots to be determined by the amount of cash advanced. Petitioner was supposed to "pick up" these lots as development was continued and when lots were needed for sale by petitioner. No date was set for picking up the lots, Olds received no guarantee with respect to return of the money and no specific amount of interest on the money was offered. On January 14, 1953, the Olds gave their check in the amount of $6,290 to Meyers and received from petitioner two warranty deeds purporting to convey to the Olds an additional 20 burial lots. Olds received no evidence of indebtedness from petitioner, and petitioner made no interest payments on the money received. Olds did not expect to get back much of his money on these lots during his lifetime but expected his estate would. Olds had no intention of selling any of the lots other than through petitioner. Petitioner claims this transaction was a loan rather than a sale and this $6,290 is in controversy. In July 1953, Olds advanced $10,082.50 more under the above arrangement and received a warranty deed for 27 lots. This transaction did not fall within the taxable year before us. Olds' family consisted only of himself *283 and his wife. 2. On August 6, 1952, Meyers approached Herman Klindworth with plans relating to the development of the cemetery and the need for additional funds. Klindworth wanted to help in this community project and asked about security and interest. Meyers told him petitioner was in no position to pay interest for at least 2 years and could only give deeds to lots. Klindworth was requested to hold title to any lots transferred to him for at least 2 years unless petitioner "picked up" some of the lots before then as sales for them developed. On August 6 and August 14, 1952, Klindworth paid to petitioner the sums of $3,240 and $1,080, respectively, and received in exchange three warranty deeds purporting to convey to him 16 burial lots. Klindworth did not purchase the lots with the intention that he would ever need them, except for one lot he picked out for his family, and was told that he had no right to sell the lots except through or to the cemetery. Klindworth did not receive any note or written acknowledgment of indebtedness from petitioner. Sometime in 1957, Klindworth was advised by petitioner's manager that someone wanted one of his lots, and he agreed that if petitioner *284 had a sale for $100 over his original cost he would release the lot. The transaction was completed by Klindworth, returning to petitioner the particular warranty deed including this lot and receiving in exchange another warranty deed for the remaining lots, plus his cost in the lot disposed of and $100. Klindworth had not released any of the other lots transferred to him at the time of trial. The $3,240 and $1,080 advanced by Klindworth are claimed by petitioner to have been loans and are in controversy. 3. Prior to August 26, 1952, Meyers talked to Bert Grieb and his wife about the need for a cemetery in the vicinity as well as their own need for a burial lot. Meyers told Grieb about petitioner's cemetery plans and that capital was needed for development. Grieb "agreed to purchase some" lots on the understanding that the price of the lots would probably go up as the cemetery was developed, that the only way he could make any profit on his investment was if the prices went up, and that he had no right to sell the lots to anyone except petitioner. Meyers asked him to keep the lots for at least 2 years after which he could turn them back to petitioner, probably at a fair rate of interest, *285 but Meyers did not guarantee anything. On August 26, 1952, Grieb paid to petitioner the sum of $3,240 and received several warranty deeds evidencing the conveyance of 12 burial lots. Grieb intended to keep two of the lots for his own use. $2,700 of this amount ($3,240 less $540 for the two lots Grieb intended to keep) is claimed by petitioner to have been a loan and is in controversy. On July 7, 1953, Grieb was advised by petitioner that someone wanted one of his lots. The deed for this lot was given back to petitioner, and petitioner gave Grieb $385 in exchange which Grieb considered to be the then fair market value of the lot. Grieb had paid $270 for this lot. Grieb later acquired additional lots but had not turned back any additional lots at the time of trial. Petitioner also transferred to other individuals more lots than they would be expected to use and received therefor the going price for these lots. Sometime in late 1953 some of the stockholders and lotholders began wondering about the financial affairs and management of petitioner. Hawley was bought out and one of the local residents was made president, but Meyers was retained as manager for several years. An accountant *286 was employed to keep the books. He was given access to petitioner's cash receipt and disbursement journals for the time prior to his employment but never had access to the general ledger. The accountant and a lawyer, who had become a stockholder and member of petitioner's board of directors in late 1953 or 1954, became aware of the so-called "large sales" and called the attention of the board of directors to them. The lawyer, after investigation, informed the board of a provision in the Revised Code of Washington, chapter 68.24.130, which prohibits the sale of cemetery lots for resale at a profit. The large sales were thereafter discussed by the board during a number of its meetings. Although it was decided that petitioner would no longer sell large groups of lots, the board was unable to reach any conclusion or decision with respect to the large sales already consummated, purportedly due to a lack of funds. These discussions were not recorded or mentioned in the minutes of the board's meetings. Petitioner discharged Meyers as manager in 1955 and he was not present as a witness at the trial. None of the new management of petitioner knew anything about the affairs of petitioner *287 prior to the latter part of 1953. All of the burial lot transactions prior to February 28, 1953, including those specifically mentioned above, were entered on petitioner's books as sales. Petitioner's books reflect no accounts payable, notes payable, or obligations owing to any particular lotholder during the taxable year ended February 28, 1953. Opinion The question is whether the transactions outlined in our findings of fact were outright sales of burial lots, as determined by respondent, or were in fact loans, with deeds to burial lots given as security, as claimed by petitioner. Competent evidence was presented with respect to only those transactions mentioned above so we are concerned only with the sum of $13,310 paid for the lots involved in the transactions specified as being in controversy in our findings of fact. The warranty deeds conveying the lots in question were absolute on their face. Nevertheless, a deed absolute in form will be treated as a mortgage if it was executed as security for a loan of money. Peugh v. Davis, 96 U.S. 322. It is the intention of the parties at the time the transaction was consummated that governs, and to ascertain intent, *288 all attendant facts and circumstances are to be considered as well as the instrument itself. Johnson v. National Bank of Commerce, 65 Wash. 261, 118 Pac. 21; Hoover v. Bouffleur, 74 Wash. 382, 133 Pac. 602; Phillips v. Blaser, 13 Wash. 2d 439, 125 P. 2d 291. However, to establish that a deed regular in form was given as security and intended as a mortgage, the evidence must be clear, cogent and convincing, Johnson v. National Bank of Commerce, supra; Hoover v. Bouffleur, supra, although the intent of the parties need not necessarily appear on the face of the instrument or collateral papers. Phillips v. Blaser, supra.Parol evidence is admissible to show that a deed absolute on its face was intended as a mortgage. Peugh v. Davis, supra; Phillips v. Blaser, supra. An option or agreement to repurchase or to have the property reconveyed to the transferor does not in itself indicate that a deed was intended to be a mortgage. Johnson v. National Bank of Commerce, supra; Resthaven Memorial Cemetery, Inc., 43 B.T.A. 683; Irving Fisher, 30 B.T.A. 433. *289 A factor basic to mortgage transactions is the existence of a debt and a relationship between the parties of debtor and creditor. Plummer v. Ilse, 41 Wash. 5, 82 Pac. 1009; Tesdahl v. Collins, 2 Wash. 2d 76, 97 P. 2d 649. These generally acknowledged principles have been invoked on numerous occasions by the Federal courts in their determination of the income tax consequences of transactions involving the question of sale or loan. Helvering v. F. & R. Lazarus & Co., 308 U.S. 252; Commissioner v. H. F. Neighbors R. Co., 81 F. 2d 173 (C.A. 9), affirming a Memorandum Opinion R. Co., 81 F. 2d 173 (C.A. 6), affirming a Memorandum Opinion of this Court; Resthaven Memorial Cemetery, Inc., supra; Irving Fisher, supra; William M. Davey, 30 B.T.A. 837. In the determination of this issue each case must necessarily be controlled by its own facts and peculiar circumstances. Petitioner has the burden to establish that the transactions here in issue were loans rather than sales not only because respondent has officially determined that the transactions were sales, but also because they are *290 expressly so designated in the deeds of the parties and other record evidence. Irving Fisher, supra. We do not think petitioner has carried this burden. The only competent evidence presented to support petitioner's contention was the testimony of the three individual purchasers, Olds, Klindworth and Grieb, the testimony of a lawyer who first became associated with petitioner in either the latter part of 1953 or 1954, and an accountant who first became associated with petitioner in the fall of 1953. Neither of the latter two witnesses knew anything about the specific transactions here involved nor anything about the operations of petitioner during the fiscal year here before us. Apparently neither Hawley, Meyers nor anyone else familiar with petitioner's affairs during the period in question was available as a witness, at least they were not called as such. We have outlined in our findings of fact in considerable detail the testimony of each of the three purchasers who testified for petitioner. Each of them testified that he considered the particular transaction in which he was involved and with which we are here concerned to be a "loan." However, none of them satisfactorily *291 explained why he considered the transaction to be a loan rather than a sale with the right to repurchase when and if petitioner wanted to. They testified that they paid what was considered the fair market value of the lots and received deeds for lots, the total fair market value of which would equal the amount of money paid to petitioner by them, that petitioner's representative did not warrant that petitioner would ever buy all of the lots back, or would buy them back at any particular time, but stated only that petitioner would "pick them up" as and when the cemetery was developed and the lots were needed, that no notes or other evidence of indebtedness for the amounts advanced were given by petitioner to the purchaser, that no fixed interest was agreed to be paid or was paid on the amounts advanced, that the only way they expected to get their money back was by resale of the lots to petitioner, and the only gain they could expect to receive would be from an increase in the fair market value of the lots. Their testimony also reveals that up to the time of trial only two of the total lots purchased by the three of them had been picked up or resold to petitioner, and that with respect *292 to these two lots, the witnesses had demanded and received what they considered to be the fair market value of the lot at the time of the reconveyance with no particular concern about whether the gain realized bore any relation to a fair rate of interest on the money advanced. We do not think such evidence supports the characterization of the transactions as loans; and certainly a designation of these transactions as loans by these witnesses based on such facts is not such clear and convincing evidence as is required to establish that a deed regular in form was given as security and intended as a mortgage, or to overcome the presumption of correctness of respondent's determination that these transactions were sales. The books of petitioner recorded these particular transactions as sales along with other transactions which have been conceded to be sales. The transactions here involved do not appear to be any different in form from these other transactions. In fact, it is difficult to understand how these witnesses distinguish some of their transactions, which they designated as loans, from their other transactions which they conceded to be sales. It is unquestionably true that each *293 of these individuals bought more burial lots than he could use and that each of them expected petitioner to take the excess lots off his hands. However, the price at which they were to be "picked up" was to be the fair market value of the lot at the time it was resold, and there is nothing to indicate that petitioner could have reacquired the lots for any price less than the purchasers asked for them. Each of them had complete control of which of the lots purchased he would keep for his own or his family use. The testimony as a whole indicates that the witnesses were more interested in helping the development of the cemetery, which they felt would be a good thing for their community, than they were in assurances as to how or when they would get their money back. Up to the time of the trial petitioner had apparently not recognized or assumed any specific debt or obligation to any of its large lotholders. None of the usual criteria for treating a deed as a mortgage are present in this case, such as inadequacy of consideration, a provision for a redemption or reconveyance, continued possession and control of the property by the transferor, or the existence of an underlying debt. *294 On the evidence before us we must conclude that the transactions in question were what they purported to be, that is, sales rather than loans, and that the sums received by petitioner in these transactions were includible in gross income as determined by respondent. While not controlling, because it is a factual question, Resthaven Memorial Cemetery, Inc., supra, is quite similar to this case, and we held there that the transactions were sales rather than loans. We do not think the fact that the laws of the State of Washington prohibit the sale of cemetery lots for resale at a profit is a significant factor in this case. There is no evidence that any of the parties involved in these transactions had knowledge of or gave consideration to this provision of the law until sometime after these transactions were consummated, and even to date no steps have been taken to rectify the violation of this law, if such it was. Decision will be entered for the respondent.